562 So.2d 702 (1990)
C.M. LIFE INSURANCE COMPANY, Appellant,
v.
Erika Estela ORTEGA, a Minor, through Her Mother, Estela Ortega, As Guardian of the Minor, and Estela Ortega, Individually, Appellees.
Nos. 88-3067, 89-2167.
District Court of Appeal of Florida, Third District.
February 27, 1990.
Rehearing Denied July 13, 1990.
Stinson, Lyons, Gerlin & Bustamante and Mark D. Greenberg and Michael P. Bennett, Miami, for appellant.
*703 Horton, Perse & Ginsberg and Edward Perse, and Carroll & Halberg, Miami, for appellees.
Before BARKDULL, NESBITT and FERGUSON, JJ.
PER CURIAM.
Insured maintained two insurance policies with C.M. Life Insurance Co., one of which was a $100,000 life insurance policy which limited proceeds payable to premiums paid, if the insured died by suicide while sane or insane, within two years of the policy's issue. After the insured's death, his wife and daughter sought full payment of proceeds. C.M. Life claimed the insured had committed suicide within the contestable period. After a non-jury trial, the trial court entered final judgment in favor of the wife and daughter as to both policies. As to the $100,000 policy and the attorney's fees subsequently awarded, we reverse the trial court's order based upon the following analysis.
On the night insured killed himself, he and his girlfriend had dinner at his mother's home with several family members. The insured consumed several glasses of alcohol. His girlfriend observed that he was depressed over the outcome of his divorce and the fact he could not see his six-month-old daughter on a more regular basis; he talked negatively about himself, and he appeared extremely despondent. After the insured and his girlfriend returned to his apartment, the insured walked into his bedroom, picked up his revolver, and returned to his living room. He removed all of the bullets from the gun and then replaced one bullet. He spun the cylinder and put the gun to his head. After he pulled the trigger the first time, the girlfriend, observing insured's actions, tried to convince him to stop. He replied, "See, nothing happened," and added, "If you are meant to die, you're meant to die." The insured then fired the fatal bullet into his head.
The psychiatrist testifying for the insurer outlined numerous factors in the insured's life which fell within a recognized suicidal personality profile. Insured was going through a divorce, had suffered a recent financial loss, was changing jobs, and was facing the possibility of having difficulty in terms of contact with his infant child. The psychiatrist further testified that the effect of the alcohol the insured consumed would be to take away discrimination, sensitivity, fear, shame, and guilt, and to allow underlying depressive feelings to surface.
In response to the evidence of suicide, family members and business associates testified that the insured's mental attitude was bright rather than bleak. Psychiatrists testifying for appellees stated that while the insured was a "macho" type and a show-off, he did not fit the personality profile likely to commit suicide.
Although a presumption against suicide exists, it is overcome when either party introduces evidence of suicide. World Ins. Co. v. Kincaid, 145 So.2d 268 (Fla. 1st DCA 1962), cert. discharged, 157 So.2d 517 (Fla. 1963). Once credible evidence of suicide appears, the presumption against suicide "vanishes" and the case must be decided on all the evidence. Id. at 271. The facts are weighed by the trier of fact, who may make the determination that the insured committed suicide by considering circumstantial as well as direct evidence. Gulf Life Ins. Co. v. Weathersbee, 126 Fla. 568, 172 So. 235 (1936). Florida, along with a majority of jurisdictions, requires proof of suicide to be established by a preponderance of the evidence. Sovereign Camp of Woodmen of the World v. Hodges, 72 Fla. 467, 73 So. 347 (1916). Here, we conclude that the conflicting testimony of the insured's relatives and experts called on their behalf does not overcome the preponderance of evidence of suicide.
Appellees rely on the case of Gulf Life Ins. Co. v. Nash, 97 So.2d 4 (Fla. 1957) for the proposition that in order to preclude recovery of life insurance benefits under a suicide exclusion clause, the insurer must prove that the insured acted with the intent to take his own life. In Nash, the insured had never examined the gun with which he fatally injured himself. He was in good *704 humor and joking with friends when he aimed a gun at his chest and mortally wounded himself. Thereafter, he immediately cried, "My God, the gun was loaded ... I am shot. Call a doctor." Based on these facts, the supreme court determined that sufficient evidence was presented to support the lower court's determination that Nash had not committed suicide.
We find those cases, such as Nash, where the decedent accidently shot himself with a gun he thought was empty, not to control the factual situation before us. See Harrington v. New York Life Ins. Co., 193 F. Supp. 675 (N.D.Cal. 1961), aff'd, 299 F.2d 803 (9th Cir.1962); see also Harvey v. St. Paul Western Ins. Cos., 166 So.2d 822 (Fla. 3d DCA 1964). In the instant case, evidence demonstrated the insured was depressed and despondent. He knew the gun was loaded. The shooting was the result of a conscious decision to play a game with death. We conclude that where the harm which befalls the insured is a reasonable and probable consequence of his volitional act, the harm cannot be deemed unintentional. Paraphrasing Justice Cardozo's dissent in Landress v. Phoenix Mut. Life Ins. Co., 291 U.S. 491, 501, 54 S.Ct. 461, 464, 78 L.Ed. 934 (1934), as adopted by the majority in Nash, 97 So.2d at 9, if there is no accident in the means, there is none in the result.
Sub judice, the trial court concluded that the insured's death was the inadvertent result of the insured's attempt at a display of machismo and it found that the insured "did not intend to fire a cartridge or to cause his death, but rather intended to show how brave he was in defying the odds by virtue of this playing Russian Roulette." We conclude that this analysis, under the facts given, was contrary to the weight of the evidence and represented a speculative hypothesis and as such could not be employed to overcome the evidence of suicide once the presumption against suicide was nullified. New Horizons Telecasting Corp. v. Professional Ins. Corp., 200 So.2d 835 (Fla. 1st DCA), cert. denied, 207 So.2d 690 (Fla. 1967).
Here, as in Kincaid, the plaintiff's proof was insufficient in law and fact to overcome the ballistic reports, the witness's statements, and the police testimony. See Koger v. Mutual of Omaha Ins. Co., 152 W. Va. 274, 163 S.E.2d 672 (1968) (beneficiary under policy covering death resulting from accidental bodily injury could not recover under evidence that immediately previous to shooting, insured had suggested playing Russian Roulette and had taken certain steps conforming to that design and died as a result of gunshot wound in the head); see also Thompson v. Prudential Ins. Co. of America, 84 Ga. App. 214, 66 S.E.2d 119 (1951) (Russian Roulette death no less intentional than had gun been fully loaded and cannot be result of accident, but rather it should be presumed that the participant intended that he should be killed or injured should fate stop cartridge in spinning cylinder in the firing position).
Accordingly, the trial court's order is reversed as to the $100,000 policy and in light of this decision, the interlocutory order that the insurer pay attorney's fees is likewise reversed.